REDACTED VERSION – PUBLICLY FILED

4

## CIVIL COVER SHEET

JS 44   (Rev 3/99)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )

### I. (a) PLAINTIFFS
Mayne Pharma (USA) Inc.

**DEFENDANTS**
American Pharmaceutical Partners, Inc ,
Bigmar, Inc., Bigmar-Bioren Pharmaceuticals, S.A

(b) County of Residence of First Listed Plaintiff  New Castle County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

(c) Attorney's (Firm Name, Address, and Telephone Number)
Adam W. Poff (No 3990)
Young Conaway Stargatt & Taylor, LLP
PO Box 391
Wilmington, DE  19899-0391
(302) 571-6600

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
      Plaintiff

☒ 3  Federal Question
      (U S. Government Not a Party)

☐ 2  U.S. Government
      Defendant

☐ 4  Diversity
      (Indicate Citizenship of Parties
      in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                        and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment
  & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted
  Student Loans
  (Excl. Veterans)
- ☐ 153 Recovery of Overpayment
  of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product
  Liability
- ☐ 320 Assault, Libel &
  Slander
- ☐ 330 Federal Employees'
  Liability
- ☐ 340 Marine
- ☐ 345 Marine Product
  Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle
  Product Liability
- ☐ 360 Other Personal Injury

*PERSONAL INJURY*
- ☐ 362 Personal Injury—
  Med. Malpractice
- ☐ 365 Personal Injury—
  Product Liability
- ☐ 368 Asbestos Personal
  Injury Product
  Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal
  Property Damage
- ☐ 385 Property Damage
  Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/
  Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate
  Sentence
  Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure
  of Property 21 USC
- ☐ 630 Liquor Laws
- ☐ 640 R. R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational
  Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards
  Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt Reporting
  & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret Inc
  Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal
  28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U S. Plaintiff
  or Defendant)
- ☐ 871 IRS—Third Party
  26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and
  Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/
  Exchange
- ☐ 875 Customer Challenge
  12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of
  Information Act
- ☐ 900 Appeal of Fee Determination
  Under Equal Access to
  Justice
- ☐ 950 Constitutionality of
  State Statutes
- ☐ 890 Other Statutory Actions

### V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
      Proceeding

☐ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      another district
      (specify)

☐ 6  Multidistrict
      Litigation

☐ 7  Appeal to
      District
      Judge from
      Magistrate
      Judgment

### VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause
Do not cite jurisdictional statutes unless diversity )

Action for violations of the Sherman and Clayton Acts and claims of breach of contract, fraud, tortious interference with contractual relations and prospective business advantages, and fraudulent conveyance

### VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
  UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:  ☒ Yes  ☐ No

### VIII. RELATED CASE(S)
IF ANY
(See
instructions)

JUDGE

DOCKET
NUMBER

DATE
12/29/04

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG JUDGE _____

REDACTED VERSION – PUBLICLY FILED

JS 44 Reverse (Rev 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.     (a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F R.C.P , which requires that jurisdictions be shown in pleadings  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.     Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.     Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U S C Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.     Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.     Requested in Complaint. Class Action  Place an "X" in this box if you are filing a class action under Rule 23, F R.Cv.P

Demand  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.     Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

REDACTED VERSION – PUBLICLY FILED

AO 85 (Rev. 8/98) Notice, Consent, and Order of Reference — Exercise of Jurisdiction by a United States Magistrate Judge

# UNITED STATES DISTRICT COURT

District of _____

|  |  |
|---|---|
| Plaintiff<br>V.<br><br>Defendant | NOTICE, CONSENT, AND ORDER OF REFERENCE —<br>EXERCISE OF JURISDICTION BY A UNITED STATES<br>MAGISTRATE JUDGE<br><br>Case Number:    1 5 6 4 |

## NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION

In accordance with the provisions of 28 U.S.C. §636(c), and Fed.R.Civ.P. 73, you are notified that a United States magistrate judge of this district court is available to conduct any or all proceedings in this case including a jury or nonjury trial, and to order the entry of a final judgment. Exercise of this jurisdiction by a magistrate judge is, however, permitted only if all parties voluntarily consent.

You may, without adverse substantive consequences, withhold your consent, but this will prevent the court's jurisdiction from being exercised by a magistrate judge. If any party withholds consent, the identity of the parties consenting or withholding consent will not be communicated to any magistrate judge or to the district judge to whom the case has been assigned.

An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.

## CONSENT TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE

In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.

| Party Represented | Signatures | Date |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## ORDER OF REFERENCE

IT IS ORDERED that this case be referred to _____
United States Magistrate Judge, to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §636(c) and Fed.R.Civ.P. 73.

_____
Date

_____
United States District Judge

NOTE: RETURN THIS FORM TO THE CLERK OF THE COURT <u>ONLY IF</u> ALL PARTIES HAVE CONSENTED <u>ON THIS FORM</u> TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE

REDACTED VERSION – PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAYNE PHARMA (USA) INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMERICAN PHARMACEUTICAL | ) |
| PARTNERS, INC., BIGMAR, INC., | ) |
| and BIGMAR-BIOREN | ) |
| PHARMACEUTICALS, S.A., | ) |
| | ) |
| Defendants. | ) |

C.A. No. _____

DEMAND FOR JURY TRIAL

**FILED UNDER SEAL**

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
DEC 29 2004

0 4 - 1 5 6 4

## COMPLAINT

Plaintiff Mayne Pharma (USA) Inc. hereby demands trial by jury as to all issues triable of

right by a jury and, for its complaint against defendants Bigmar, Inc., Bigmar-Bioren

Pharmaceuticals, S.A. and American Pharmaceutical Partners, Inc. alleges as follows:

    1.      This action arises from misconduct by the defendants to foreclose plaintiff Mayne

Pharma (USA) Inc. ("Mayne") from continued participation in the US wholesale markets for

certain cancer drugs and also from entering the US wholesale markets for other such drugs. The

result of the defendants' conduct was to substantially lessen competition in such markets and to

provide defendant American Pharmaceutical Partners, Inc. ("APP") with monopolies in the

markets for certain of the drugs – at a time when there is a worldwide shortage of some such

drugs. Among other misconduct alleged herein, APP violated the federal antitrust laws by

acquiring the manufacturing facilities for the drugs from the sole available supplier to Mayne.

The defendants also breached and tortiously interfered with the three supply contracts for the

63688 1001

drugs between defendant Bigmar, Inc. ("BI"), defendant Bigmar-Bioren Pharmaceuticals, S.A. ("BBP" and collectively with BI, "Bigmar") and Mayne, engaged in a fraudulent conveyance of the manufacturing facilities and otherwise defrauded Mayne. By this action, Mayne seeks: (1) rescission of APP's acquisition of the manufacturing facilities; (2) declaratory judgment that APP is a "successor" to Bigmar in accordance with the terms of the three supply contracts; (3) mandatory injunctions in the form of specific performance of the contracts; (4) monetary damages, including trebled damages; and (5) a mandatory injunction requiring that Bigmar return to Mayne certain unused raw materials provided to it by Mayne.

2.      The parties' dispute concerns four cancer drugs, Methotrexate, Leucovorin, Fluorouracil and Cisplatin. Methotrexate is a particularly powerful chemotherapy used in the treatment of many types of cancer, often after other treatment options have failed. Leucovorin is a "rescue drug" that chemically binds to Methotrexate (and other cancer drugs) when Methotrexate is not used properly, and in doing so, prevents Methotrexate from having an adverse effect on patients' folic acid levels. Fluorouracil is a chemotherapy that is given as a treatment for certain types of cancer including bowel, breast, stomach, and gullet cancer. Cisplatin is a chemotherapy given as a treatment for certain types of cancer including testicular, bladder, lung, gullet, stomach, and ovarian cancers.

3.      As set forth in detail below, in Fall 2003, Mayne was a substantial participant in the US wholesale markets for Methotrexate and Leucovorin and was in the final stages of plans to enter the US wholesale markets for Fluorouracil and Cisplatin. In October 2003, Mayne lawfully entered into one contract and assumed two additional contracts (from Xanodyne Pharmacal, Inc.) with BI and BBP for the manufacture and supply of Methotrexate, Leucovorin and Fluorouracil. At that same time, Mayne was making arrangements with Bigmar for it to

2

design, develop and then sell Cisplatin to Mayne. Bigmar was one of the only manufacturers, if not the only manufacturer, in the world capable of producing Methotrexate, Leucovorin, Fluorouracil and Cisplatin. Upon receiving the drugs from Bigmar, Mayne intended to resell the four drugs to its customers in the US as a wholesale distributor and had entered into supply contracts to that effect with such customers.

4.    Bigmar and APP, another reseller of Bigmar-produced drugs and one of Mayne's chief competitors in the US wholesale markets, knew in October 2003 that Mayne was completely dependent upon Bigmar for its entire supply of Methotrexate and Leucovorin and would soon be dependant on Bigmar for its supply of Fluorouracil and Cisplatin. Upon information and belief, in an attempt to cut off Mayne's supply of the drugs and thereby force Mayne out of the US wholesale markets for those drugs, APP set out to purchase Bigmar's Barbengo facility (later known as the Lugano facility), which housed Bigmar's entire operations for the development of Methotrexate, Leucovorin, Fluorouracil and Cisplatin. Upon the acquisition of the Barbengo plant in July 2004, Bigmar and APP promptly refused to perform any of Bigmar's contracts with Mayne or continue with the planned production and sale of Cisplatin to Mayne. Neither Bigmar nor APP, as successor to Bigmar under the terms of the three contracts, has ever performed any of its obligations under the contracts or begun to produce and sell Cisplatin to Mayne.

5.    To date, Mayne has been able to secure an alternative supplier for only two of the required presentations of Methotrexate, specifically the powdered presentations. It has been unable to secure an alternative supplier for any of the Leucovorin, Fluorouracil and Cisplatin presentations. The actions of APP have therefore forced Mayne entirely out of the US wholesale markets for Methotrexate (except with respect to the powdered presentations) and Leucovorin

3

REDACTED VERSION – PUBLICLY FILED

and have prevented Mayne from competing in the US wholesale markets for Fluorouracil and Cisplatin. Upon information and belief, APP, by virtue of the acquisition and its refusal to honor the supply contracts, has now willfully acquired a monopoly at least with respect to the US wholesale markets for certain presentations of Methotrexate and preserved a monopoly with respect to the US wholesale market for a Fluorouracil presentation.

6.    During the negotiation of the Barbengo acquisition, upon information and belief, Bigmar also engaged in fraud at the prompting of APP. Even as Bigmar prepared to sell the Barbengo facility, it repeatedly assured Mayne that, despite some delays, it would perform in accordance with the contracts, while knowing full well that its pending sale of the facility to APP would certainly threaten, and most likely prevent, such performance. Mayne relied to its detriment upon Bigmar's assurances in not seeking or developing internally alternative sources of Methotrexate, Leucovorin, Fluorouracil and Cisplatin.

7.    Having almost entirely deprived Mayne of its anticipated supply of Methotrexate, Leucovorin, Fluorouracil and Cisplatin and knowing that Mayne would be unable to replace the supply in the near future, APP, upon information and belief, sought to steal Mayne's customers. APP's deliberate interference with and refusal to perform Mayne's contracts with Bigmar and its interference with Mayne's relationships with its customers have caused Mayne to lose prospective sales.

4

## JURISDICTION AND VENUE

8.     This is an action for injunctive and monetary relief based on claims arising, in part, under the antitrust laws of the United States. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1337. This Court has personal jurisdiction over each defendant and venue is proper under 28 U.S.C. § 1391.

## PARTIES

9.     Plaintiff Mayne is a corporation organized under the laws of Delaware, with its principal offices in Paramus, New Jersey. Mayne manufactures intravenous medications for the treatment of critically ill patients and is also engaged in the business of supplying multi-source injectable pharmaceuticals in the United States.

10.     Defendant APP is a corporation organized under the laws of Delaware, with its principal offices in Schaumburg, Illinois. APP develops, manufactures and markets injectable pharmaceutical products.

11.     Defendant BI is a corporation organized under the laws of Delaware, with its principal offices in Johnstown, Ohio. Through its wholly-owned subsidiary, BBP, Bigmar manufactures generic pharmaceutical oncology products and intravenous infusion solutions.

12.     Defendant BBP is organized under the laws of Switzerland and is the wholly-owned subsidiary of BI. As such, BBP manufactures generic pharmaceutical oncology products and intravenous infusion solutions.

WP3 1069405 1                                                                                          63688 1001

## FACTUAL ALLEGATIONS

Pre-Acquisition Market Conditions

13.     In Fall 2003, Mayne participated in the U.S. wholesale markets for Methotrexate preservative free presentations 1000mg/40ml vial, 500mg/20ml vial, 250mg/10ml vial, 200mg/8ml vial, 100mg/10ml vial, and 50mg/2ml vial. Its share of these markets was approximately REDACTED There were, at the time, three other companies competing in the US wholesale markets for those presentations of Methotrexate. They were APP, Bedford Labs and Xanodyne Pharmacal, and they had market shares of approximately REDACTED respectively. As such, the markets for the Methotrexate presentations were highly concentrated.

14.     At the same time, Mayne participated in the US wholesale markets for Leucovorin presentations 350mg/vial and 200 mg/vial. Its share of these markets was approximately REDACTED As with Methotrexate, the market for each of the Leucovorin presentations was highly concentrated. There were three other companies competing in the markets – APP (appr. REDACTED market share), Bedford Labs (appr. REDACTED market share) and Sicor Pharmaceuticals (appr. REDACTED market share). Methotrexate and Leucovorin have different side effect profiles and efficacies than other drugs and therefore are not interchangeable with other drugs.

15.     Also in Fall 2003, Mayne was making final arrangements to enter the US wholesale markets for Fluorouracil presentation 200mg/vial and Cisplatin presentations 1mg/vial, 50mg/vial and 100 mg/vial by purchasing the drugs from Bigmar and then reselling them in the US. At that time, there were three companies competing in the US wholesale market for that presentation of Fluorouracil – APP (appr. REDACTED market share), Sicor Pharmaceuticals (appr. REDACTED market share) and Valeant (appr. REDACTED market share). There were five companies competing in the US wholesale market for the presentations of Cisplatin – APP (appr REDACTED

6

REDACTED VERSION – PUBLICLY FILED

market share), Bristol-Myers Oncology (appr. [REDACTED] market share), Bedford Labs (appr. [REDACTED] market share), Baxter (appr. [REDACTED] market share) and Sicor Pharmaceuticals (appr. [REDACTED] market share). As such, the markets for these presentations were also highly concentrated, and, as with Methotrexate and Leucovorin, there are no reasonable substitutes for these drugs.

16.    Moreover, there were and are significant barriers to new competitors seeking to enter the US wholesale markets for the four drugs. This is so because, among other reasons, there are few facilities in the world with the requisite equipment to manufacture Methotrexate, Leucovorin, Fluorouracil and Cisplatin, and any new competitor would be required to obtain FDA approval before marketing one or more of the drugs in the US, which involves an uncertain, time-consuming process. In addition, long-standing supply agreements with exclusivity provisions limit the availability of such facilities to potential competitors in the US wholesale markets.

The Contracts

17.    Mayne entered into one and assumed two supply contracts with Bigmar. On October 24, 2003, Mayne, through its predecessor in interest, Faulding Pharmaceutical Co., and BBP entered into two agreements (collectively, the "First BBP Contract"), which together involve the manufacturing, shipping and licensing of Leucovorin Preservative Free 200mg/vial, Methotrexate Preservative Free 1000mg/40ml, 500mg/20ml and 200mg/8ml and Fluorouracil 200mg/vial. Those agreements are the License and Marketing Agreement By and Between Bigmar-Bioren Pharmaceutical S.A. and Faulding Pharmaceutical, Co. (the "Licensing Agreement") (attached as "Exhibit A") and the Manufacture and Supply Agreement (relating to the Licensing and Marketing Agreement) By and Between Bigmar-Bioren Pharmaceutical S.A. and Faulding Pharmaceutical, Co. (the "Supply Agreement") (attached as "Exhibit B").

18.    In the Licensing Agreement, BBP grants to Mayne a non-exclusive right in the US to distribute, market and sell Methotrexate, Leucovorin and Fluorouracil in the presentations stated above. The Agreement specifically requires, among other things, that BBP, during the five-year term of the agreement, "conduct ... development [and] manufacturing ... activities which are necessary to ... ensure continued supply of [Leucovorin, Methotrexate and Fluorouracil]." (Art. 2.3(a))   The Agreement further requires that BBP "manufacture and supply each of [Leucovorin, Methotrexate and Fluorouracil] to [Mayne] in accordance with the Supply Agreement." (Art. 2.4)   Finally, the Agreement contains a provision stating that "the Agreement shall be binding upon the successors and assigns of the Parties." (Art. 5.3)

19.    In the corresponding Supply Agreement, BBP contracted to manufacture and ship to Mayne Leucovorin, Methotrexate and Fluorouracil in the presentations stated above, based on the submission of purchase orders to BBP by Mayne. The Agreement specifically provides as follows:

- "During the term of the Agreement, [BBP] shall use its best efforts to manufacture, label and package, ship and deliver, each of the [Leucovorin, Methotrexate and Fluorouracil] on the terms and conditions specified in the Agreement ... . Each of the [Leucovorin, Methotrexate and Fluorouracil] shall be manufactured by BBP at the [Barbengo facility] in accordance with the terms of this Agreement ... ." (Art. 4.01)

- "[BBP] agrees to provide at cost and expense all labor, materials, facilities, including without limitation, all premises, equipment, machinery, heat, light, and power sufficient for the manufacture of [Leucovorin, Methotrexate and Fluorouracil]." (Art. 4.06)

- "Unless [BBP] notifies [Mayne] in writing within fifteen (15) days of the receipt of the purchase order that it is unable to deliver [Leucovorin, Methotrexate and Fluorouracil] in accordance with such purchase order, [BBP] will be deemed to have accepted such order as a binding order." (Art. 5.02)

- "This Agreement shall be binding upon the successors and assigns of the Parties. ..." (Art. 20)

8

63688.1001

WP3:1069405.1

20.    On October 29, 2003, Mayne assumed from Xanodyne Pharmacal, Inc. ("Xanodyne") the Manufacturing and Labeling Agreement between Xanodyne and BBP (the "Second BBP Contract") (attached as "Exhibit C"), whereby BBP contracted to supply exclusively to Mayne Leucovorin in the presentation Injection 350mg/vial Lyophilized based on the submission of purchase orders to BBP by Mayne. The Contract specifically states that "[BBP] agrees to manufacture and package, and to sell to [Mayne] and [Mayne] agrees to purchase from [BBP] such quantities of the [Leucovorin] as [Mayne] may from time to time order for resale and distribution by [Mayne] within the [United States] ....." (Art. 2) BBP further agreed that orders would be shipped by the date identified on the purchase order by Mayne, provided the purchase order was received at least ninety days before the requested shipping date. (Art. 7) The parties also agreed that the Contract would be binding upon "successors." (Art. 14(k))

21.    Also on October 29, Mayne assumed from Xanodyne, which had previously assumed from Wyeth, the Supply Agreement – United States Between Wyeth Acting By and Through Its Wyeth Pharmaceuticals Division and Bigmar, Inc. (the "BI Contract") (attached as "Exhibit D"). The BI Contract involves the manufacture, shipment and licensing of Methotrexate in the following presentations: Injectable USP, 50mg P.F., 2ml vial; Injectable USP, 100mg P.F., 10ml vial; Injectable USP, 250mg P.F., 10ml vial; Injectable USP, 50mg Preserved, 2ml vial; and Injectable USP, 250mg Preserved, 10ml vial. BI contracted to manufacture and ship to Mayne Methotrexate in these presentations based on the submission of purchase orders to BI by Mayne. The Agreement specifically provides as follows:

   ○    "During the term of this Agreement, Bigmar shall manufacture, label and package the [Methotrexate] for [Mayne] on the terms and conditions specified in this Agreement for distribution and sale in the [United States]. All [Methotrexate]

9

REDACTED VERSION – PUBLICLY FILED

shall be manufactured at the [Barbengo facility] in accordance with the terms of this Agreement … ." (Art. 3.01)

○     "Bigmar agrees to provide at cost and expense all labor, materials, facilities, including without limitation, all premises, equipment, machinery, heat, light, and power sufficient for the manufacture of [Methotrexate]" (Art. 3.12)

○     "Unless Bigmar notifies [Mayne] in writing within fifteen (15) days of the receipt of the purchase order that it is unable to deliver [Methotrexate] in accordance with such purchase order, Bigmar will be deemed to have accepted such order as a binding order." (Art. 4.03)

○     "This Agreement shall be binding upon the successors and assigns of the Parties. …" (Art. 20)

Bigmar's Failure to Perform

22.     On November 20, 2003, Mayne placed eight purchase orders with BI for Methotrexate in accordance with the requirements of the BI Contract. The total purchase price of the orders was $839,100 and the requested delivery dates spanned from December 4, 2003 to March 1, 2004. Mayne placed one additional purchase order under the contract on or about January 5, 2004. The purchase price of that order was $96,600 and the requested delivery date was March 5, 2004. BI has never filled these purchase orders. According to APP, however, one of the requested batches was created by BI, but was then discarded due to contamination with microbes after APP acquired the Barbengo facility.

23.     Also on November 20, Mayne placed a purchase order with BBP for Leucovorin in accordance with the requirements of the Second BBP Contract. The purchase price of the order was $169,500 and the requested delivery date was January 10, 2004. Mayne placed two additional purchase orders for Leucovorin under the contract on December 18, 2004. The total purchase price of those orders was $339,000 and the requested delivery date was February 10, 2004. BBP has never filled these purchase orders.

24.    On January 5, 2004, Mayne placed three purchase orders with BBP for Methotrexate in accordance with the requirements of the First BBP Contract. The total purchase price of the orders was $153,934 and the requested delivery date for the orders was March 5, 2004. Mayne also placed a purchase order under the contract for Leucovorin on the same day. The purchase price of that order was $26,640 and the requested delivery date was also March 5. BBP has never filled these purchase orders.

25.    Finally, on January 5, 2004, Mayne placed three purchase orders with BBP for Fluorouracil in accordance with the requirements of the First BBP Contract. The total purchase price of the orders was $143,550 and the requested delivery date for the orders was March 5, 2004. BBP has also never filled these purchase orders.

The Raw Materials

26.    In an effort to assist Bigmar's production of Methotrexate, Leucovorin and Fluorouracil, Mayne agreed to amend the three agreements such that Mayne would begin to supply certain of the raw materials needed for the development of the drugs. Under the terms of each of the amendments, the amount Mayne owed for each shipment of Methotrexate, Leucovorin and Fluorouracil would be discounted by the value of the raw materials used therein that were furnished by Mayne. With respect to unused raw materials, the amendments each contained the following provision:

> BIGMAR acknowledges and agrees that (i) Mayne shall hold all right, title and interest to the [raw] Materials at all times during and after the term of the Agreement, (ii) MAYNE is consigning the Materials to BIGMAR for BIGMAR to hold in trust for the benefit of MAYNE and (iii) the Materials may only be used by BIGMAR in accordance with, and for purpose of undertaking BIGMAR's obligations under the Original Agreement. Furthermore, BIGMAR agrees to ... do such acts as MAYNE may require from time to time to protect MAYNE's interest in the Materials and permit and facilitate MAYNE's exercise of its unrestricted rights of ownership, use, enjoyment and possession relating to the

11

Materials wherever located, including without limitation, promptly returning the Materials to MAYNE at MAYNE's request . . . .

(Amendment No. 2 to the Supply Agreement – United States Art. 8;  Amendment No. 2 to the Manufacturing and Labeling Agreement Art. 8; Amendment No. 1 to the Manufacturing and Supply Agreement Art 8 (emphasis added)) (attached as Exhibit E)

27.    Notwithstanding the parties' amendment of the three agreements, Bigmar has failed to fill even a single purchase order under the three contracts.  As a result, Mayne has suffered and continues to suffer irreparable harm in that it is currently without sufficient Methotrexate, Leucovorin and Fluorouracil, and no alternative source can provide the drugs in the amounts it requires and expected from Bigmar.

Bigmar's False Assurances of Future Performance

28.    As Mayne came under greater pressure from its US customers to provide Leucovorin, Methotrexate and Fluorouracil, it inquired with increasing frequency as to why Bigmar had not filled Mayne's purchase orders for the drugs.  In response, Bigmar, most often through the late John Tramontana, the former CEO of BI, offered a myriad of excuses for the delays.

29.    On May 7, 2004, Bigmar said it could not fill orders because its shipments of stoppers had been delayed.  On May 10, Tramontana informed Mayne that the delays were directly related to the financial situations of Bigmar.  A few days later, while the FDA was on site to perform a seemingly routine inspection of the Barbengo facility, Tramontana not only refused to fill Mayne's purchase orders, but also inexplicably refused to have so much as a teleconference to discuss Bigmar's failure to perform.  Then, on May 14, Tramontana provided yet another excuse -- he told Mayne that there was a malfunction in the "filling line" and that production would be delayed another six weeks.  On May 30, Bigmar had difficulty scheduling a

63688 1001

WP3:1009405.1

REDACTED VERSION – PUBLICLY FILED

teleconference concerning the status of production for early June because, as Tramontana put it, it was "the time of the year where all the customers and prospective customers come, because of the nice weather and vacations," and on June 29, Bigmar postponed yet another important teleconference because it was scheduled on a Swiss holiday.

30.     With each new excuse, however, came further assurances from Bigmar that it would fill the purchase orders in the near future.  Among other false assurances, on May 10, 2004, Tramontana sent to Brian McCudden, Mayne's Vice President of Operations, an e-mail stating that despite the delays he "ha[d] the best interest in supplying Mayne" and that Bigmar would begin supply of the drugs after the FDA left the facility.  In a June 10 e-mail, Tramontana assured McCudden that "production was starting June 21."  On June 23, Gianmarie Alippi of BBP sent to McCudden and Raymond Jenkins, Mayne's Demand and Logistics Manager, an e-mail with a full production schedule for July 2004, indicating that six orders of Methotrexate and two orders of Leucovorin would be filled that month.  On July 1, Tramontana confirmed that production was then forecasted to begin on July 12.

31.     Ultimately, Bigmar never filled a single purchase order from Mayne.  Upon information and belief, Bigmar knew, when it made at least certain of the assurances of future performance, that APP was in the process of acquiring the Barbengo facility and that APP did not intend to perform Bigmar's contracts with Mayne.  Mayne relied to its detriment upon these assurances in not seeking or developing internally an alternative sources of Leucovorin, Methotrexate and Fluorouracil.

The Acquisition of the Barbengo Facility

32.     On or about July 28, 2004, APP acquired from Bigmar the Barbengo facility and with it all of Bigmar's equipment and assets necessary for the manufacture of Leucovorin,

Methotrexate, Fluorouracil and Cisplatin. APP paid $11 million for the facility and certain product rights. At that time of the acquisition, Bigmar was experiencing financial difficulties. Upon information and belief, APP was aware of Bigmar's contracts with Mayne when it acquired the Barbengo facility, and the defendants performed the transaction, at least in part, to hinder Mayne in its capacity as both a competitor of APP and a creditor of Bigmar. Also, upon information and belief, Bigmar did not receive adequate value for the Barbengo facility, as a portion of the consideration paid for the facility was paid directly to John Tramontana, rather than to Bigmar.

33.    Almost immediately after the acquisition, Bigmar began the process of winding down all business operations. APP now owns all of Bigmar's equipment for the production of Leucovorin, Methotrexate, Fluorouracil and Cisplatin, and Bigmar will likely soon cease to exist. APP is therefore the "successor" to Bigmar to the BI Contract, First BBP Contract and Second BBP Contract, respectively, and is therefore bound by the terms of the contracts to fill Mayne's pending purchase orders. In a September 9 e-mail, however, Rich Nassar of APP informed McCudden that APP would "not take on the Mayne contracts." APP has failed to date to fill any of Mayne's purchase orders for Leucovorin, Methotrexate and Fluorouracil.

The Effects of the Acquisition and the Defendants' Subsequent Actions on Market Conditions

34.    As a result of APP's and Bigmar's independent and combined actions, Mayne was forced to look elsewhere for replacement drugs, but was only able to secure replacement supplies of Methotrexate in the two powder presentations, 20mg and 1000mg, both from Wyeth. Mayne has now been forced to resort to developing a facility to manufacture its own Methotrexate, Leucovorin, Fluorouracil and Cisplatin in Australia. It will take Mayne no less than approximately one year at a substantial expense to establish the capacity and ability to

WP3 1069405 1                                                    63688 1001

REDACTED VERSION – PUBLICLY FILED

manufacture the drugs in the amounts Mayne had contracted (or planned to contract) to receive from Bigmar. During this time, Mayne will be completely foreclosed from the US wholesale markets for the presentations of Methotrexate (except for the two powdered presentations), Leucovorin, Fluorouracil and Cisplatin set forth above. Had Bigmar informed Mayne, in a timely manner, that it would never fill Mayne's purchase orders or that APP was intent on acquiring the Barbengo facility and would refuse to perform, and thereby breach, the three supply contracts with Mayne, Mayne could have taken steps to mitigate the resulting damages. Upon information and belief, in taking the foregoing actions, APP and Bigmar willfully drove Mayne from or prevented it from entering the US wholesale markets for the four drugs.

35.     Having taken from Mayne its only current and potential supplier of Leucovorin, Methotrexate, Fluorouracil and Cisplatin and thereby foreclosed Mayne from competing in the US wholesale markets for the four drugs in the presentations stated above, APP turned its attention to producing the drugs for itself and, upon information and belief, sought to steal Mayne's customers. Since APP's acquisition of the Barbengo facility and as a result of APP's apparent efforts to interfere with Mayne's relationships with its customers, Mayne has lost a number of important customers to APP. Mayne's resulting damages in terms of lost profits are significant and will continue to accrue as Mayne loses additional sales and customers while it works to develop an acceptable alternative source of Methotrexate, Leucovorin, Fluorouracil and Cisplatin.

36.     The acquisition also had a profound anticompetitive effect on the wholesale markets for the stated presentations of Leucovorin, Methotrexate, Fluorouracil and Cisplatin by lessening competition and enhancing APP's market power and ability to increase price with respect to each of the presentations. The resulting reduction in competition will have a negative

WP3 1069405 1                                          63683 1001

effect on the healthcare providers that must buy the drugs from APP in order to treat their patients. Upon information and belief, as a result of the acquisition, APP has willfully obtained (or attempted to obtain) monopolies at least with respect to the US wholesale markets for the presentations of Methotrexate and maintained (or attempted to maintain) a monopoly at least with respect to the Fluorouracil presentation.

37.    The foregoing issues have also had a significant effect on the current quality of healthcare for cancer patients. The actions and inactions of Bigmar and APP have contributed to a worldwide public health concern. Since acquiring the Barbengo facility, APP has not produced sufficient amounts of Methotrexate. Because of APP's monopoly share of the Methotrexate markets, its production failures have resulted in a shortage of US-approved Methotrexate.

The Defendants' Refusal to Return the Raw Materials

38.    As previously stated, Mayne provided raw materials to Bigmar for the sole purpose of aiding it in the production of Methotrexate, Leucovorin and Fluorouracil. In addition to failing to produce the drugs, Bigmar and APP have now refused to return certain materials provided by Mayne. Those materials include Methotrexate API (active ingredients), gloves, stoppers, vials and other supplies with a collective value of approximately $1 million. Upon information and belief, the materials are being stored in a warehouse in Switzerland. Mayne's efforts to recover the materials from the defendants have thus far failed.

## COUNT I
(Rescission of APP's Acquisition of the Barbengo Facility
(or, In the Alternative, Trebled Monetary Damages Against APP) Based on
Violations of § 7 of the Clayton Act)

39    Mayne repeats and realleges the allegations of paragraphs 1 through 38 as though set forth fully herein.

16

40.    Just prior to the transfer of the Barbengo facility from Bigmar to APP, Mayne had approximately [REDACTED] of the US wholesale markets for Methotrexate preservative free presentations 1000mg/40ml vial, 500mg/20ml vial, 250mg/10ml vial, 200mg/8ml vial, 100mg/10ml vial, and 50mg/2ml vial.  It had between [REDACTED] of the US wholesale market for Leucovorin presentations 350mg/vial and 200 mg/vial.  Mayne had also contracted to have Bigmar produce Fluorouracil presentation 200mg/vial and had made arrangements for it to produce Cisplatin  presentations 1mg/vial, 50mg/vial and 100 mg/vial, both for resale by Mayne in the US.  The US wholesale markets for each of these presentations were highly concentrated at the time of the acquisition, and there were (and are today) substantial barriers for any new competitors attempting to enter these markets.

41.    Bigmar and APP engaged in independent and concerted activities, namely APP's acquisition of the Barbengo facility from Bigmar (at less than fair market value, upon information and belief) and their collective refusal to perform the three supply contracts with Mayne, that have effectively denied Mayne a supply of Leucovorin, Methotrexate (except for two powdered presentations, 20mg and 1000mg), Fluorouracil and Cisplatin, and thereby foreclosed Mayne from competing in the US wholesale markets for each of the stated presentations of these drugs.  Mayne has been competitively harmed as a result of these events.

42.    In addition to the competitive harm suffered specifically by Mayne, the wholesale markets for each of the respective presentations of Leucovorin, Methotrexate (except for two powdered presentations), Fluorouracil and Cisplatin have been harmed due to the elimination of Mayne as a significant competitor or potential competitor and the resulting lessening of competition.  That lack of competition and APP's resulting ability to raise prices unilaterally will

63688 1001

have a negative effect on the healthcare providers that must buy the drugs in order to treat their patients.

43.    Based on violations of § 7 of the Clayton Act, Mayne seeks rescission of APP's acquisition of the Barbengo facility pursuant to § 16 of the Clayton Act, or, in the alternative, trebled monetary damages pursuant to § 4 of the Clayton Act.

## COUNT II
(Rescission of APP's Acquisition of the Barbengo Facility
(or, In the Alternative, Monetary Damages Against APP and Bigmar)
Based on Violation of § 1 of the Sherman Act)

44.    Mayne repeats and realleges the allegations of paragraphs 1 through 43 as though set forth fully herein.

45.    Through their concerted efforts to exclude Mayne from the US wholesale markets for Methotrexate, Leucovorin, Fluorouracil and Cisplatin, APP and Bigmar conspired to and did in fact unreasonably restrain trade in the markets for the stated presentations of the four drugs.

46.    Based on violations of § 1 of the Sherman Act, Mayne seeks rescission of APP's acquisition of the Barbengo facility, or, in the alternative, trebled monetary damages.

## COUNT III
(Rescission of APP's Acquisition of the Barbengo Facility
(or, In the Alternative, Monetary Damages Against APP)
Based on Violation of §2 of the Sherman Act)

47.    Mayne repeats and realleges the allegations of paragraphs 1 through 46 as though set forth fully herein.

48.    APP, by virtue of the acquisition and its refusal to honor the supply contracts, has now willfully acquired monopolies at least with respect to the US wholesale markets for the stated Methotrexate presentations and maintained a monopoly with respect to the US wholesale market for the Fluorouracil presentation.

63688 1001

WP3 1069405 1

49.    APP's increased marked share is not the result of growth or development as a result or as a consequence of a superior product, business acumen or historical accident.

50.    APP's conduct since the acquisition has been anticompetitive.

51.    Based on violations of § 2 of the Sherman Act, Mayne seeks rescission of APP's acquisition of the Barbengo facility, or, in the alternative, trebled monetary damages.

## COUNT IV
(Rescission of APP's Acquisition of the Barbengo Facility
(or, In the Alternative, Monetary Damages Against APP)
Based on APP's Attempted Monopolization)

52.    Mayne repeats and realleges the allegations of paragraphs 1 through 51 as though set forth fully herein.

53.    APP engaged in anticompetitive conduct described above with the specific intent to gain or maintain monopolies at least with respect to the stated presentations for Methotrexate and Fluorouracil, and there is a dangerous probability that it will achieve monopolies with respect to those markets.

54.    Based on APP's attempted monopolization, Mayne seeks rescission of APP's acquisition of the Barbengo facility, or, in the alternative, trebled monetary damages.

## COUNT V
(Specific Performance by (or, In the Alternative, Damages Against)
BI on Grounds of Breach of the BI Contract)

55.    Mayne repeats and realleges the allegations of paragraphs 1 through 54 as though set forth fully herein.

56.    Mayne lawfully assumed the BI Contract from Xanodyne.

57.    BI is required under the terms of the BI Contract to fill Mayne's past, present and future purchase orders for Methotrexate in certain presentations.

19

REDACTED VERSION – PUBLICLY FILED

58.    Mayne has placed nine purchase orders for Methotrexate in accordance with the terms of the BI Contract, none of which BI has filled.

59.    Mayne cannot purchase replacement Methotrexate from an alternative source due to the scarcity of manufacturers of Methotrexate and the current worldwide shortage of US-approved Methotrexate.

60.    Mayne therefore seeks specific performance of the BI Contract by BI because there is no adequate remedy at law for BI's breach.  In the alternative, Mayne seeks compensation for BI's breach.

## COUNT VI
### (Damages Against BI on Grounds of Fraud)

61.    Mayne repeats and realleges the allegations of paragraphs 1 through 60 as though set forth fully herein.

62.    As detailed above, BI misrepresented on numerous occasions its ability and intent to fill and the time in which it would fill Mayne's purchase orders for Methotrexate.

63.    Mayne reasonably relied on BI's misrepresentations in not seeking or developing internally an alternative source of Methotrexate.

64.    BI subsequently refused to supply Mayne with Methotrexate.

65.    Mayne suffered damages as a result of BI's misrepresentations and Mayne's reasonable reliance thereon.

## COUNT VII
### (Specific Performance by (or, In the Alternative, Damages Against) BBP on Grounds of Breach of the First and Second BBP Contracts)

66.    Mayne repeats and realleges the allegations of paragraphs 1 through 65 as though set forth fully herein.

WP3:1069405 1                                                                63688.1001

67.    Mayne and BBP lawfully entered into the First BBP Contract and Mayne lawfully assumed the Second BBP Contract from Xanodyne.

68.    BBP is required under the terms of the First BBP Contract to fill Mayne's past, present and future purchase orders for Methotrexate, Leucovorin and Fluorouracil in certain presentations, and is required under the terms of the Second BBP Contract to fill Mayne's purchase orders for Leucovorin in certain presentations.

69.    Mayne has placed three purchase orders for Methotrexate, three orders for Fluorouracil and one order for Leucovorin in accordance with the terms of the First BBP Contract and four purchase orders for Leucovorin in accordance with the terms of the Second BBP Contract, none of which BBP has filled.

70.    Mayne cannot purchase replacement Methotrexate, Leucovorin or Fluorouracil from an alternative source due to the scarcity of manufacturers of the drugs and the current worldwide shortage of US-approved Methotrexate.

71.    Mayne therefore seeks specific performance of the First and Second BBP Contracts by BBP because there is no adequate remedy at law for BBP's breaches.  In the alternative, Mayne seeks damages to compensate for BBP's breaches.

### COUNT VIII
(Damages Against BBP on Grounds of Fraud)

72.    Mayne repeats and realleges the allegations of paragraphs 1 through 71 as though set forth fully herein.

73.    As detailed above, BBP misrepresented on numerous occasions its ability and intent to fill and the time in which it would fill Mayne's purchase orders for Methotrexate, Leucovorin and Fluorouracil.

63688 1001

WP3:1069405.1

74.     Mayne reasonably relied on BBP's misrepresentations in not seeking or developing internally an alternative source of Leucovorin, Methotrexate and Fluorouracil.

75.     BBP subsequently refused to supply Mayne with Methotrexate, Leucovorin and Fluorouracil.

76.     Mayne suffered damages as a result of BBP's misrepresentations and Mayne's reasonable reliance thereon.

## COUNT IX
### (Declaratory Judgment That APP Is a "Successor" to BI
### Under the Terms of the Bigmar Contract)

77.     Mayne repeats and realleges the allegations of paragraphs 1 through 76 as though set forth fully herein.

78.     The main purpose of the BI Contract is to provide an arrangement by which BI manufactures and then sells Methotrexate to Mayne.

79.     The BI Contract states that the agreement shall be binding upon the parties' "respective successors."

80.     When APP acquired the Barbengo facility, it succeeded to and took control of Bigmar's entire Methotrexate operation, including all of Bigmar's assets used for the production of Methotrexate. Upon selling the Barbengo facility, Bigmar began to wind down all business operations.

81.     Mayne therefore seeks a declaratory judgment that APP is a "successor" to BI as the term is used in Article 14(l) of the BI Contract, or as otherwise provided by law.

WP3:1069405 1                                              63688 1001

## COUNT X
(Declaratory Judgment That APP Is a "Successor" to BBP
Under the Terms of the First and Second BBP Contracts)

82.    Mayne repeats and realleges the allegations of paragraphs 1 through 81 as though set forth fully herein.

83.    The main purpose of the First and Second BBP Contracts is to provide an arrangement by which BBP manufactures and then sells to Mayne Methotrexate, Leucovorin and Fluorouracil.

84.    The First and Second BBP Contracts state that the agreement shall be binding upon the parties' "successors."

85.    When APP acquired the Barbengo facility, it succeeded to and took control of BBP's entire Methotrexate, Leucovorin and Fluorouracil operations, including all of BBP's assets used for the production of those drugs.  Upon selling the Barbengo facility, BBP began to wind down all business operations.

86.    Mayne therefore seeks a declaratory judgment that APP is a "successor" to BBP as the term is used in Articles 5.3 and 20 of the Licensing Agreement and the Supply Agreement, respectively, which together comprise the First BBP Contract and Article 20 of the Second BBP Contract, or as otherwise provided by law.

## COUNT XI
(Specific Performance by (or, In the Alternative, Damages Against) APP
on Grounds of Breach of the BI Contract)

87    Mayne repeats and realleges the allegations of paragraphs 1 through 86 as though set forth fully herein.

88.    Mayne lawfully assumed the BI Contract from Xanodyne.

WP3:1069405 1                                          63688 1001

89.    APP is a "successor" to BI as the term is used in Article 14(l) of the BI Contract, or as otherwise provided by law, and is therefore bound by the BI Contract.

90.    APP is thus required under the terms of the BI Contract to fill Mayne's past, present and future purchase orders for Methotrexate in certain presentations.

91.    Mayne has placed four purchase orders for Methotrexate in accordance with the terms of the BI Contract, none of which APP has filled.

92.    Mayne cannot purchase sufficient replacement Methotrexate from an alternative source due to the scarcity of manufacturers of Methotrexate and the worldwide shortage of US-approved Methotrexate.

93.    Mayne therefore seeks specific performance of the BI Contract by APP because there is no adequate remedy at law for APP's breach.  In the alternative, Mayne seeks damages to compensate for APP's breach.

## COUNT XII
(Specific Performance by (or, In the Alternative, Damages Against)
APP on Grounds of Breach of the First and Second BBP Contracts)

94.    Mayne repeats and realleges the allegations of paragraphs 1 through 93 as though set forth fully herein.

95.    Mayne and BBP lawfully entered into the First BBP Contract, and Mayne lawfully assumed the Second BBP Contract from Xanodyne.

96.    APP is a "successor" to BBP as the term is used in Articles 5.3 and 20 of the Licensing Agreement and the Supply Agreement, respectively, which together comprise the First BBP Contract, and as the term is used in Article 20 of the Second BBP Contract, or as otherwise provided by law.

WP3 1069405 1

97.    APP is therefore required under the terms of the First and Second BBP Contracts to fill Mayne's past, present and future purchase orders for Methotrexate, Leucovorin and Fluorouracil in certain presentations.

98.    Mayne has placed three purchase orders for Methotrexate, three orders for Fluorouracil and one order for Leucovorin in accordance with the terms of the First BBP Contract, and four purchase orders for Leucovorin in accordance with the terms of the Second BBP Contract, none of which APP has filled.

99.    Mayne cannot purchase sufficient replacement Methotrexate, Leucovorin and Fluorouracil from an alternative source due to the scarcity of manufacturers of the drugs and the worldwide shortage of Methotrexate.

100.    Mayne therefore seeks specific performance of the First and Second BBP Contracts by APP because there is no adequate remedy at law for APP's breaches.  In the alternative, Mayne seeks damages to compensate for APP's breaches.

## COUNT XIII
(In the Alternative, Specific Performance of
Art. 8 of the Amendments to the BI Contract and First and
Second BBP Contracts and Damages for Wasted
Raw Materials)

101.    Mayne repeats and realleges the allegations of paragraphs 1 through 100 as though set forth fully herein.

102.    In Article 8 of the Amendment to each of the supply agreements, Bigmar, and APP as its successor, contracted to return to Mayne all unused raw materials provided by Mayne for the production of Methotrexate, Leucovorin and Fluorouracil.

WP3 1069405 1                                                    63688 1001

103.    Upon information and belief, Bigmar and APP have failed to return raw materials provided by Mayne worth approximately $1 million, and those materials are now being held in a warehouse in Switzerland.

104.    In addition, certain of the raw materials provided by Mayne were used in the batch of Methotrexate that was discarded by APP because it was allegedly contaminated with microbes.

105.    Mayne now seeks return of the unused raw materials pursuant to Article 8 of the Amendments and damages for the raw materials wasted in the discarded batch.

## COUNT XIV
(Damages Against APP on Grounds of Tortious Interference
With Contractual Relations – BI Contract)

106.    Mayne repeats and realleges the allegations of paragraphs 1 through 105 as though set forth fully herein.

107.    The BI Contract was a valid and enforceable contract between BI and Mayne.

108.    APP was aware of the BI Contract when it acquired the Barbengo facility and purposefully did not perform the Contract.

109.    By acquiring Bigmar's entire Methotrexate operation and then refusing to perform the BI contract, APP intentionally and unjustifiably induced and caused BI's breach of the BI Contract, and Mayne was damaged as a result.

## COUNT XV
(Damages Against APP on Grounds of Tortious Interference
With Contractual Relations – First and Second BBP Contracts)

110.    Mayne repeats and realleges the allegations of paragraphs 1 through 109 as though set forth fully herein.

WP3 1069405 1                                                    63688 1001

111.    The First and Second BBP Contracts are valid and enforceable contracts between BBP and Mayne.

112.    APP was aware of the First and Second BBP Contract when it acquired the Barbengo facility and purposefully did not perform the Contracts.

113.    By acquiring Bigmar's entire Methotrexate, Leucovorin and Fluorouracil operations and then refusing to perform the First and Second BBP contracts, APP intentionally and unjustifiably induced and caused BBP's breach of the First and Second BBP Contracts, and Mayne was damaged as a result.

## COUNT XVI
### (Damages Against APP on Grounds of Tortious Interference
With Prospective Business Advantage)

114.    Mayne repeats and realleges the allegations of paragraphs 1 through 113 as though set forth fully herein.

115.    At the time APP acquired the Barbengo facility, Mayne had a reasonable expectancy that it would receive Methotrexate and Leucovorin from Bigmar and would be able to resell the drugs to its customers in the United States.

116.    APP was aware of that expectancy when it purchased the facility.

117.    By acquiring Bigmar's entire Methotrexate and Leucovorin operations and then refusing to perform their contracts with Mayne, APP intentionally and unjustifiably eliminated Mayne's supply of the drugs.

118.    In doing so, APP caused the termination of Mayne's business expectancy and induced Mayne's former customers to buy Methotrexate, Leucovorin and Fluorouracil from APP or another competitor.

119.    Mayne has suffered damages as a result of APP's actions.

27

## COUNT XVII

(Rescission of APP's Acquisition of the Barbengo Facility
(or In the Alternative Monetary Damages) Based on Fraudulent Conveyance)

120. Mayne repeats and realleges the allegations of paragraphs 1 through 119 as though set forth fully herein.

121. The sale of the Barbengo facility from Bigmar to APP for $11 million was for the purpose of hindering Mayne as both a competitor of APP and a creditor of Bigmar.

122. Upon information and belief, Bigmar did not receive adequate consideration from APP in connection with the acquisition of the Barbengo facility.

123. At the time of the acquisition, Bigmar was experiencing financial difficulties.

124. Mayne has suffered damages as a result of the defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Mayne prays for the following relief:

(a)    entry of judgment rescinding APP's acquisition of the Barbengo facility based on violations of §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act, or, in the alternative, entry of judgment awarding trebled monetary damages (pursuant to §4 of the Clayton Act) for such violations;

(b)    entry of judgment rescinding APP's acquisition of the Barbengo facility based on the defendants' fraudulent conveyance, or, in the alternative, entry of judgment awarding monetary damages based on such conveyance;

(c)    entry of judgment requiring that BI specifically perform the BI contract;

(d)    entry of judgment awarding damages for BI's fraud;

(e)    entry of judgment requiring that BBP specifically perform the First and Second BBP Contracts;

63688 1001

(f)    entry of judgment awarding damages for BBP's fraud;

(g)    entry of declaratory judgment that APP is a "successor" to BI under the terms of the BI Contract and thus bound by the Contract;

(h)    entry of declaratory judgment that APP is a "successor" to BBP under the terms of the First and Second BBP Contracts and thus bound by the Contracts;

(i)    entry of judgment requiring that APP specifically perform the BI Contract, the First BBP Contract, and the Second BBP Contract;

(j)    in the alternative, entry of judgment awarding damages for the defendants' breaches of the BI Contract, the First BBP Contract, and the Second BBP Contract;

(k)    in the alternative, entry of a mandatory injunction requiring that Bigmar return to Mayne all unused raw materials provided to it by Mayne;

(l)    entry of judgment awarding damages for APP's tortious interference with the BI Contract, the First BBP Contract, and the Second BBP Contract;

(m)    entry of judgment awarding damages for APP's tortious interference with Mayne's prospective business advantages;

(n)    prejudgment interest on all recovered sums; and,

(o)    such other and further relief as this Court deems just, equitable and necessary to fully effectuate the rights of Mayne with respect to the subject matter of this case.

63688 1001

Dated: Wilmington, Delaware
       December 29, 2004

_____
C. Barr Flinn (No. 4092)
Adam W. Poff (No. 3990)
YOUNG, CONAWAY, STARGATT & TAYLOR
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6698

*Attorneys for plaintiff Mayne Pharma (USA) Inc.*

WP3 1069405 1                                                    63688 1001

REDACTED VERSION – PUBLICLY FILED

EXHIBIT A

REDACTED

REDACTED VERSION – PUBLICLY FILED

EXHIBIT  B

056748.1001

REDACTED

REDACTED VERSION – PUBLICLY FILED

EXHIBIT  C

REDACTED VERSION – PUBLICLY FILED

REDACTED

REDACTED VERSION – PUBLICLY FILED

EXHIBIT D

WP3.978645.1

REDACTED VERSION – PUBLICLY FILED

REDACTED

REDACTED VERSION – PUBLICLY FILED

EXHIBIT E

REDACTED VERSION – PUBLICLY FILED

REDACTED